---

### Ex parte HORN.

(District Court, W. D. Washington, N. D. May 26, 1923.)

No. 7576.

1. Aliens ⬅54—Review of order of deportation limited to question of fair hearing.

On habeas corpus by an alien under order of deportation, the inquiry of the court is limited to the question whether he was accorded a fair and impartial hearing, and the sufficiency of the evidence cannot be considered.

2. Aliens ⬅49—"Person likely to become a public charge" not necessarily pauper, or mentally or physically defective.

To constitute an alien a "person likely to become a public charge," and subject to exclusion under Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), it is not necessary that he be classed as a pauper or mentally or physically defective, as affecting his ability to earn a livelihood.

3. Aliens ⬅49—Alien subject to imprisonment on entry is "person likely to become public charge."

An alien, who, when he entered the United States, was engaged in a conspiracy to violate its laws, which subjected him to prosecution and imprisonment, is a "person likely to become a public charge," within the meaning of Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918. Comp. St. Ann. Supp. 1919, § 4289¼b), and subject to exclusion or deportation.

Habeas Corpus. Petition by Al Horn for writ to secure release from custody as an undesirable alien. Denied.

The petitioner, a Hebrew alien, native of Russia (now Poland), entered at the port of New York, in July, 1913. proceeding to Seattle, where he has since resided. He has a wife and children living in Poland. In December, 1920, he went to Canada, became involved in the importation of 22 cases of

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

liquor, and re-entered the United States, was arrested, and prosecuted under the Washington state Prohibition Act, pleaded guilty, and was fined and imprisoned. He was thereafter arrested and charged with being found in the United States in violation of Immigration Act Feb. 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼a et seq.), to wit: "That he was a person likely to become a public charge at the time of his entry and that he entered without inspection." A hearing was duly had, and he was ordered deported by the Secretary of Labor to his home in Poland. A petition for rehearing was thereafter filed, the order of deportation was suspended, and the record was again reviewed, and the petition for rehearing and cancellation denied, and the former order of deportation permitted to stand.

On February 8, 1923, the matter was before the Board of Review again for reconsideration of warrant proceedings. The Board of Review made the following findings: "On January 27, 1921, it was directed that the alien be deported. Again on June 1, 1921, a like order issued. Habeas corpus proceedings were then instituted, but the petition was subsequently withdrawn. On June 20, 1922, the department denied an application for rehearing. However, inasmuch as the facts are so apparent in this case, the Board of Review is of the opinion that a rehearing can serve no good purpose. It will be noted that the alien was fined $450, and was sentenced to a term of 30 days for his connection with the liquor deal. The usual statements concerning hardships incident to deportation are set forth in the application. It is likewise stated that the man should be given an opportunity to send for his family. However, it is noted that, although he has been able to maintain a Chandler automobile, he apparently has not evidenced, at least by his acts, a desire to bring his family over here during the several years he has resided in this country. It is recommended that the application for rehearing be denied, and that the alien's deportation be effected without further delay." And it was so ordered.

The petitioner states, further, that he was not accorded a fair trial, and that the charges are without foundation. At the hearing before the immigration inspector the petitioner was represented by counsel. With relation to the entry into the United States and the importation of whisky as a basis for the charge he said: "A. I will tell you the truth. I purchased the whisky at Vancouver, B. C., and then made arrangement with this man Rogers to meet me at White Rock, B. C. I took the whisky from Vancouver to White Rock, B. C., by automobile, met Rogers, and turned the whisky over to him. Rogers smuggled it across the line into the United States. I met him again at Blaine, and for what he did in connection with this I paid him $200. Q. How much whisky did you purchase? A. Twenty-two cases. Q. What did you pay for it? A. Eleven hundred dollars." He further testified with relation to his financial condition: "Q. How much money have you got? A. Ten thousand dollars. Q. Invested in mortgages? A. Loan and cash. Q. You have money in the Guardian Savings Bank, and the National Bank, and also some mortgages? A. Yes, sir."

Bausman, Oldham, Bullitt & Eggerman, of Seattle, Wash., for petitioner.

Thomas P. Revelle, U. S. Dist. Atty., and C. E. Hughes, Asst. U. S. Dist. Atty., both of Seattle, Wash.

NETERER, District Judge (after stating the facts as above). [1] The sole question for this court to determine is whether the petitioner was accorded a fair trial. This court said in Ex parte Moola Singh et al., 207 Fed. 780, at page 782, and repeated this in Ex parte Chin Doe Tung, 236 Fed. 1017, at page 1018:

"The authority of the immigration officers and the jurisdiction of the courts depend upon power conferred by Congress. It is a matter of legislation. No discretion is vested in the courts. Congress has the right to legislate upon the subject, prescribe rules, fix limits, and confer authority where

It deems wise, in legislating upon the subject at hand. The supreme authority is conferred upon the immigration officers. The jurisdiction of the court is limited to ascertaining whether the petitioners were denied a hearing."

In Ex parte Chin Doe Tung, supra, 236 Fed. at 1018, it is said:

"The court's inquiry is limited as to whether the applicant was accorded an impartial hearing, and it cannot inquire into the sufficiency of the probative facts, or consider reasons for the conclusions reached by the immigration officers. The question is not, would the court have come to the same conclusion? but, was the petitioner accorded a fair hearing? Chin Yow v. U. S., 208 U. S. 8."

The petitioner was accorded a fair hearing; extraordinary consideration has been given his case. Does the testimony bring him within the inhibitions of the Immigration Act? The record is conclusive that the petitioner was not likely to become a public charge, in the sense that he would be a "pauper" or an occupant of an almshouse for want of means of support (Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114), or likely to be sent to an almshouse for support at public expense (Ex parte Mitchell [D. C.] 256 Fed. 229; Howe v. United States ex rel. Savitsky, 247 Fed. 292, 159 C. C. A. 386, Ng Fung Ho v. White [C. C. A.] 266 Fed. 765).

[2] Section 3, Act Feb. 5, 1917 (section 4289¼b), excludes "paupers" classed with persons of constitutional psychopathic inferiority, and persons not comprehended within the foregoing class are "mentally or physically defective"—"such physical defect being of a nature which may affect the ability of such alien to earn a living." Then follows another classification:

"Persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude."

Then polygamists, anarchists, or those who advocate the assassination of public officials, or the unlawful destruction of property, or affiliated with organizations teaching opposition to organized government. Then follow various classifications, and then the classification: "Persons likely to become a public charge." The contention that the phrase "persons likely to become a public charge" must by construction mean paupers, or mentally or physically defective, as affecting the ability to earn a livelihood, or persons habitually criminal, is not well taken.

The term "likely to become a public charge" is not associated with paupers or professional beggars, idiots, and certified physical and mental defectives, as in Act Feb. 20, 1907, as amended by Act March 26, 1910 (36 Stat. 263), and is differentiated from the application in Gegiow v. Uhl, supra. "Public" is defined by Bouvier as "the whole body politic, or all the citizens of the state." The public in this case is the people, the government of the United States. "Charge" (Webster): To lay on, impose tax, duty, or trust. A judgment is a charge upon land. Darling v. Roger, 22 Wend. (N. Y.) 491. It may be said it is a responsibility peculiar to the person affected, and a public charge, to be a person committed to the custody of a department of the government by due course of law.

[3] The petitioner at the time of entry had conspired with another to violate the laws of the United States. Conspiracy is a felony. Criminal Code, § 335 (Comp. St. § 10509). He admitted having committed a felony, and is excluded by the act, and unquestionably liable to become a public charge, in that he was subject to prosecution in the courts of the United States, and likely to be convicted on his own admission, and subject to imprisonment for two years. In Ex parte Tsunetaro Machida, 277 Fed. 239, at page 241, this court said:

"When he was convicted he became a public charge, and a tax, duty, and trust was imposed upon the government by his conduct; and at the time of his entry he was likely to become a public charge by reason of the crime which he had committed."

The instant case is on "all fours" with that case, except that a formal judgment of conviction is not entered. The department having found the defendant entered the United States without inspection and likely to become a public charge, there being testimony to support the conclusion, the court may not weigh the testimony, and the writ is denied.