## Ex parte BRITTEN.

(District Court, W. D. Washington, N. D.    October 26, 1923.)

### No. 7840.

**1. Aliens ⬅➡49—Alien subject to arrest and imprisonment is liable to become "public charge."**

An alien who, as shown by the evidence, is liable to be convicted and sentenced to imprisonment for a violation of law, is "liable to become a public charge," within the meaning of the immigration laws.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Public Charge.]

**2. Aliens ⬅➡54—Order of deportation held supported by evidence.**

Evidence that an alien entered the United States without the inspection required by law, and that he had committed a felony before entry, *held* to support an order for his deportation.

Habeas Corpus. Petition of William Henry Britten for writ to secure relief from order for deportation. Writ denied.

The petitioner, a native of Ireland, citizen of Canada, 38 years of age, married, literate, came to Canada from England, an enlisted man in the British navy, landing at Vancouver, B. C., in 1910, stationed at Esquimalt. He deserted in 1911. From 1911 to 1917 he was employed as a member of the crew of the steamship Prince Rupert, Grand Trunk Steamship Company, sailing out of Victoria. In January, 1917, he enlisted in the Canadian army at Victoria, served two years, served overseas, and was honorably discharged at Victoria March 6, 1919. Immediately after his discharge he came to the United States on a visit, returning to Canada within a few days. About March 20, 1919, he came to the United States to stay. June 15, 1922, he went to Victoria, returning July 6, following, since which last date he has been in the United States. He testified that upon entering he was not inspected; that certain questions were asked, which he answered, and it was not his intention to clandestinely enter the United States. To the question: "Did you go to the immigration office at Victoria before coming here?" Answer: "I went up there. They asked me what I wanted. I said, 'I am going to Seattle.' They gave me a card with the immigration officer's authority on it. I walked aboard the vessel, and that was all there was to it." Upon his entry July 6th: "Q. Did you go to the immigration office at Victoria and get a pass to come to the United States? A. Yes. Q. What name did you give them? A. Britten. A. What did you tell the immigration officers in Victoria? A. I said, 'I am going to Seattle;' that is all I said. Q. Did he ask you where you were living? A. No. Q. The whole conversation was that you told him that you wanted to come to the United States, and he gave you a pass? A. Yes; that is all. Q. Did he charge you a head tax? A. No."

While in the employ of the steamship company, sailing between Victoria and Prince Rupert, the alien and Daisy (Dorothy) Meacock became infatuated with each other, and had what is noted in the record as "a love affair," which continued until he enlisted in the Canadian army, and upon enlisting, he says, at the woman's suggestion, he enlisted as a married man, giving this woman as his wife. It appears that the army records show: "No. 2025181 Pte. H. W. Britten * * * was granted permission to marry 23—4—17; wife's name Mrs. Dorothy Britten; proceeded overseas to England 2—6—17; proceeded to France to 29th Battalion, 6—6—18; admitted No. 53 General Hospital, Boulogne, 6—9—18. gunshot wound in legs, right arm, and hand; invalided to England 10—9—18; discharged from hospital 27—11—18; returned to Canada and struck off strength under demobilization at Vancouver, B. C. 6—3—19." Britten testifies that he was not married, that one-half of his pay, $15 per month, was withheld, he thought, to be paid to him upon his

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

discharge, but was in fact paid to the woman as his wife. The Canadian government also paid her an equal amount. He testifies this woman came to Seattle on the same boat with him March 20, 1919, and they lived in the same apartment; that he boarded with her, he paying for his room and board. The Seattle City Directory, for the years 1920, 1921, and 1922, lists the name of H. W. Britten with the name Daisy, or Dorothy, in parenthesis following the name. On June 6, 1922, in Seattle, he married Elizabeth Walsh, at the time a citizen of the United States. On June 15, 1922, he went to Victoria, B. C., accompanied by Mrs. Meacock, and the following day they were married. He says that this woman compelled him to go to Victoria under threat of arrest, and by some hypnotic influence and threats compelled him to marry her against his wishes. The testimony shows the marriage ceremony was performed in a church in Victoria. He says this woman threatened to have him prosecuted under the Mann Act (Comp. St. §§ 8812–8819), as well as the laws of British Columbia, for defrauding the Canadian government in the allotment to this woman as his wife.

Several days after the marriage in Victoria the petitioner's wife from the United States arrived in Victoria, and on the 6th of July, the petitioner and his lawful wife returned to the United States. Shortly thereafter the Victoria woman came to Seattle and later caused his arrest for bigamy. The petitioner and the woman had not consummated the Victoria marriage by cohabitation in the state of Washington. He was tried in the criminal courts at Seattle, Wash. He defended on the ground that he entered the marriage ceremony under duress, and that the Victoria marriage, not having been consummated by cohabitation in the state of Washington, was not bigamous under the laws of Washington. The law of Washington provides: "Every person who having a husband or wife living shall marry another person or continue to cohabit with such second husband or wife in this state shall be guilty of bigamy." The petitioner was acquitted. The petitioner does not come within any of the prohibited classes with relation to health or physical disability. He had, upon entering the United States in July, 1922, $500. He has been employed since his entry in gainful occupation, earning for a time $125 per month, and is at present receiving $110 per month. He is ordered deported by the Secretary of Labor on the ground "that he has been convicted of or admits the commission of a felony, or other crime or misdemeanor involving moral turpitude, prior to his entry into the United States, that he was a person likely to become a public charge at the time of his entry, and that he entered without inspection." The petitioner contends that he was not accorded a fair trial.

W. A. Gilmore, of Seattle, Wash., for petitioner.

Thomas P. Revelle, U. S. Atty., and De Wolfe Emory, Asst. U. S. Atty., both of Seattle, Wash.

NETERER, District Judge (after stating the facts as above). [1] The sole question for the court to determine is whether a fair trial was accorded the petitioner, and whether there was any evidence to support the order of deportation. Chin Yow v. U. S., 208 U. S. 11, 28 Sup. Ct. 201, 52 L. Ed. 369. Upon the argument, the question of "likely to become a public charge" was not pressed. In view of the conclusion that must be reached, I should say that "likely to become a public charge" is not limited to physical or mental condition, and ability to labor, or lack of funds, but is comprehended likewise within a status and responsibility peculiar to the person affected. A public charge may be a person committed to the custody of a department of the government by a court of law. In re Horn, 292 Fed. 455. If, under disclosed facts, the petitioner was likely to be committed to a department of the government for violating the Mann Act, for bringing this woman

in interstate commerce into the United States for immoral purposes, which he said the woman threatened to do, he would, if convicted, become a public charge, or, if living in a state of adultery in the state of Washington with the woman prior to re-entering the United States July 6th, she being a married woman at the time, would likewise be liable to the criminal statutes of the state. Ex parte Reeves, 292 Fed. 766. The testimony shows that the alien and the woman came to the United States on the same boat in March, 1919. When asked whether they went to the immigration station at Victoria, he said, "No; I went myself." On arriving at Seattle, they stopped at the same apartment. The alien said he boarded with the woman. This woman told the landlady that she was Mrs. Britten. She passed as the alien's wife, and for three years her name appeared in the City Directory in that relation. He says that they did not live in the same room. The admitted facts with relation to transportation and living after arrival in Seattle, and the fact that the woman was posing as the wife of the alien, together with the admitted relations sustained by this woman and the alien theretofore, is some evidence that the alien was likely to become a public charge.

[2] I think the defendant was accorded a fair trial. The testimony would warrant his deportation upon want of inspection alone. Every person is charged with knowledge of the law, and offices are established for the purpose of entry. The burden is upon the immigrant to comply with the law upon entry, for making full disclosures as to intent and purpose of entry, whether visitation or location, and, if location, to pay the fees and taxes imposed. The fact that he went to the immigration offices at Victoria, and said he was going to Seattle, and made no further disclosure, accepting a pass, limiting his stay, does not satisfy the law. The first trip was purely a visitation, and no different purpose was disclosed to the officers upon entry, nor were fees nor taxes paid. The record before the court is likewise conclusive that the alien committed a felony prior to entry by representations, made on enlistment, that this woman was his wife, causing the government of Canada to pay to the woman the bonus which the law of Canada provided. The story that the woman bade him to do so is the old story; it was not accepted in the first recorded case, and is no justification now.

The court may not review the findings of the Department of Labor; it can only determine whether there is any evidence tending to show that the reason enumerated in the warrant is well founded, and that is the limit of this court's jurisdiction. There is such evidence, and the writ is denied.

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes